UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELA NORMAN, individually and on behalf of others similarly situated,<br><br>Plaintiff-Petitioner,<br><br>v.<br><br>THE STANDARD FIRE INSURANCE COMPANY,<br><br>Defendant-Respondent. | CIVIL ACTION NO.:<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT

Plaintiff Angela Norman ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against The Standard Fire Insurance Company ("Standard" or "Defendant") and in support thereof states the following:

## NATURE OF THE ACTION

1.  When Plaintiff Norman suffered a total loss of her vehicle, Standard failed to pay her the full amount to which she was entitled under her automobile policy. This was not an isolated incident. To the contrary, it is a fundamental component of Standard's business practices.

2.  Plaintiff Norman was the named insured under a Root automobile policy (the "Root Policy" or the "Policy"), which included Comprehensive and Collision coverage for automobile damage. Standard's Comprehensive and Collision coverages both allow for Standard to limit its liability to an insured vehicle's "actual cash value" in the event of total loss.

3.  As more fully discussed below, in Illinois, actual cash value (or ACV) means "replacement cost minus depreciation." Standard does not further define ACV, nor does it provide any explanation for how it will determine the ACV of a total-loss vehicle.

4.      Under Illinois law and its policy, Standard is obligated to base any total loss cash settlement, including an ACV cash settlement, on the retail value of the insured vehicle.

5.      Standard uses the retail value of comparable vehicles in determining the ACV of an insured vehicle.

6.      Standard, however, applies an arbitrary "condition adjustment" deduction to the retail cost of these comparable vehicles to reduce from retail value to private party value, which violates Illinois law and the insurance Policy, necessarily resulting in an underpayment when it pays ACV cash settlements.

7.      By applying this "condition adjustment," Standard has breached its promise to pay for loss under its policy, damaging Plaintiff and the other Class members.

## JURISDICTION AND VENUE

8.      Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Illinois. Defendant is a Connecticut Corporation that has its corporate headquarters in Connecticut, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Illinois.

9.      Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

10.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## THE PARTIES

*Plaintiff*

11. At all times relevant to this action, Plaintiff Norman is and was a citizen of the State of Illinois, domiciled in Macon County.

*Defendant*

12. At all times material hereto, Defendant Standard is and was a Connecticut corporation, headquartered at One Tower Square, Hartford, CT 06183, and authorized to provide insurance in the State of Illinois.

## FACTUAL BACKGROUND

A.   *Overview of Retail Value and Private Seller Value*

13. Throughout the country, and by leading vehicle valuation companies, vehicles are assigned multiple valuations, each of which is tied to a different category of transaction. In this case, the most important of these transaction categories are "retail cost" (or retail value) and "private seller cost" (or private seller value). Other categories, less relevant here, include trade-in value and wholesale value.

14. These transaction categories are not tied to the actual condition of the vehicle. For instance, the exact same vehicle will have a different (lower) assigned value for trade-in than for wholesale, a different (lower) assigned value for wholesale than for private seller, and a different (lower) assigned value for private seller than for retail.

15. The differences in assigned value between the categories is based to a large degree on consumer choice and market realities independent of actual condition. Consumers are willing to pay a car dealership more money than they are willing to pay a private seller for the exact same vehicle in the exact same condition because, amongst other reasons, they have a greater likelihood

of effective recourse against a car dealership than a private individual. Similarly, wholesale value and trade-in value are lower than retail value because car dealerships must necessarily sell a vehicle for more than they pay for it to make a profit.

16. Leading vehicle valuation companies (NADA and Kelley Blue Book, for instance) provide the aforementioned values – wholesale, trade-in, private seller, and retail – without any evaluation of the actual condition of the vehicle. In fact, industry sources, in explaining the terms of the various values assigned, assert that the values are general, with the actual value of a specific vehicle being based tied to the condition of that vehicle.

17. It is also based on a reasonable assumption, however, in that car dealerships, after purchasing a vehicle (whether at auction or as trade-in), often spend $500.00-$1,000.00 reconditioning or preparing the vehicle for re-sale. Understandably, then, there is a general assumption that, in many cases, a car for sale from a car dealership will be in a better condition than a car for sale from a private seller.

**B.     *Overview of Valuing Total-Loss Vehicles***

18. Generally, auto insurance policies are policies of indemnification – insureds pay money in the form of premiums in exchange for the promise by an insurer that should certain events occur, the insurer will put the insured back into the same position they were in prior to the event insured against.

19. In this circumstance, "loss" is the word to describe the monetary injury caused by the event insured against, or the monetary amount necessary for the insured to get back to the same position the insured was in prior to a given event. If, as a result of an accident, the door of an insured vehicle is physically damaged, the amount it would cost for the vehicle to no longer have a damaged door – i.e., the position prior to the insured event – is the "loss" suffered by the insured.

This amount necessarily includes purchasing any parts necessary along with the costs in labor to fix the damage or replace the parts. Under the theory of indemnification, of course, such amount would also be the amount owed the person indemnified.

20. Where the loss reaches a certain threshold, however, it is in the interests of many insurers not to pay the loss, but instead to declare the vehicle to be a "total loss" and to pay the ACV of the vehicle rather than the cost to repair or replace the damage to the vehicle (i.e., to restore the vehicle itself). For instance, suppose a vehicle with an ACV of $10,000.00 is severely damaged. The overall amount to buy the parts and perform the labor necessary to put the vehicle back into its pre-loss condition would be $15,000.00. In such instance, insurers are not obligated to pay the full amount of loss, i.e. $15,000. Instead, their liability is limited to the vehicle's pre-loss value, i.e., $10,000.00. Generally, this is done by limiting the insurer's liability for loss ($15,000.00) to the lesser of the vehicle's pre-loss ACV ($10,000.00) and the cost to repair and replace the damaged parts or vehicle ($15,000). In this hypothetical, because the loss exceeds the ACV, the insurer would be liable only for the ACV.

21. Of course, actual insurance policies are subject to negotiation. The parties might agree that, in the event the insured vehicle becomes a total loss, the insurer will search high and low and find and purchase the exact same vehicle make and model with the exact same color and features and the exact same mileage, and provide said vehicle to the insured. Or the parties might agree that, in the event the insured vehicle becomes a total loss, the insurer will pay the insured $1,000.00 irrespective of the value of the vehicle.

22. Most insurers, however, do not want to be obligated to find precisely the same exact vehicle with precisely the same exact mileage as the insured vehicle in the event of a total loss. Conversely, most insureds do not want a random dollar amount which may or may not approximate

the insured vehicle value. Thus, the industry standard has become that insurers do not literally go and purchase the exact same vehicle with the exact same mileage for insureds – instead, insurers promise to pay insureds in money the amount it *would* cost to go out and purchase the same vehicle and leave it to the insureds whether they want to do so, or whether they want to purchase a more expensive or less expensive vehicle, or whether they want to bury the money under a tree.

23. Also subject to negotiation (keeping in mind potential regulations or state laws), of course, is 1) how the cost to replace the vehicle will be determined and by whom and 2) what can be deducted from that cost.

24. For instance, a policy could provide that the cash value of the vehicle will be determined based on the average sale price of the vehicle in car dealerships from the same general location as the insured (which would necessarily be a promise to pay the retail cost of the insured vehicle), or the average trade-in value as determined by an industry source, or the average sale price on Craigslist by private sellers in the general location of the insured, or be completely silent on how the value will be determined, and so forth.

25. There are also general industry standards on various categories that might be deducted from the amount owed to insureds. For instance, parties might or might not contract to allow for a deduction of depreciation. Depreciation is a decrease in value of property over time, given age, use and obsolescence. A 2016 model of any given vehicle is of less value than a 2017 model of the exact same vehicle, all else being equal. A 2016 vehicle with 30,000 miles is worth less than a 2016 vehicle with 20,000 miles, all else being equal. A policy which allows for deduction of depreciation, then, means that the insurer is not going to pay the amount the insurer paid when purchasing the vehicle, and is not going to pay the cost of a newer model of the same vehicle, and is not going to pay for a vehicle of the same age but with less mileage. Instead, the

insurer is going to take depreciation into account – which means paying the cost to replace the insured vehicle with a vehicle of the same age and with the same mileage.

26. Parties also might or might not contract to allow for a deduction for dealer preparation or reconditioning charges. Deductions of this type generally represent (at least in part) the difference between retail value and non-retail value.

27. Parties also may or may not contract for an automatic and general deductible and the amount of such deductible. An automatic or general deductible has nothing to do with any factors or conditions of the property or loss – it applies (if at all) automatically, irrespective of any other factor.

28. All the aforementioned factors and issues that may or may not be addressed in a given policy are also impacted by various state laws. Many states, recognizing the disparity in bargaining position and the potential ability of insurers to force insureds (many of whom are desperate to quickly procure a vehicle to replace the total-loss vehicle) into accepting an undervalue of the insured vehicle, have implemented certain restrictions and/or requirements on determining the value of a vehicle.

29. Some states, for instance, require that the cost be determined by a recognized industry source such as NADA or Kelley Blue Book, or that an insurer offer to actually replace the vehicle, rather than simply paying an amount in money in lieu of replacement, or that the relevant cost to replace is the retail value of a vehicle rather than the private party value.

C.  *The Standard Insurance Policy*

30. Plaintiff Norman had automobile insurance through Standard. Plaintiff Norman's Standard Policy (a copy of which is attached as Exhibit A hereto) provides that Standard will pay

for loss caused by damage to the vehicle through Collision and Comprehensive coverage, which cover physical damage caused by motor vehicle accidents. (Ex. A at PD-1.)

31. The Standard Policy's Collision and Comprehensive coverages promise to pay for direct and accidental direct physical loss. (*Id.*) The Policy promises to pay for such loss in money, or to repair or replace the damaged or stolen property. (*Id.* at PD-4.)

32. The Standard Policy represents that the limit of Standard's liability for loss, with respect to "Collision" and "Comprehensive" coverage, is, inter alia, the "actual cash value of the stolen or damaged property at the time of loss." (*Id.*)

33. In determining a vehicle to be a total loss, Standard is also necessarily determining that the ACV is the basis of the amount owed to insureds, because in the insurance industry, a "total loss" is the term used to describe a situation where the cost to restore the vehicle to its pre-loss position by repairing or replacing the damage is higher than the pre-loss ACV of the vehicle. In other words, whether by restoring the damaged vehicle or paying the cost to purchase precisely the same vehicle, the end result for the insured is the same – an undamaged vehicle. If putting the insured in that position through payment of ACV and then recovering the salvage value through sale at a salvage auction will cost the insurer less than repairing the vehicle, the loss is called a "total loss."

34. ACV is undefined in the Policy. However, under Illinois law, when undefined by a policy, ACV means cost of replacement minus depreciation. *See, e.g., Carey v. American Family Brokerage, Inc.*, 909 N.E.2d 255, 263 (Ill. App. Ct. 2009) ("The proper calculation of actual cash value under both Illinois law and the policy in the case at bar is replacement cost less depreciation.").

35. With respect to the determination of ACV, the Policy does not state the method by which the vehicle will be determined. For example, the Policy does not state whether the ACV will be calculated based on NADA or Kelley Blue Book value, by some other third party, by an average of public prices by car dealerships in the area, or any other method. Instead, the Policy is silent on this issue, except that Illinois law includes requirements on permissible methods for determining a vehicle's ACV.

36. When paying cash settlements on total loss claims, Illinois requires insurers to use the "retail value" of a vehicle in determining the value of the insured vehicle and caps the amount that can be deducted (if the policy allows for deductions at all) based on the actual condition of the vehicle. Ill. Admin. Code tit. 50, § 919.80(c)(2).[1]

37. The Code further confirms that "dealer preparation" or "get ready to go" deductions from retail value are not permitted. *Id*. at § 919.80(c)(3)(B). For example, assume a vehicle is listed for sale by a car dealership for $20,000.00. In states that do not require payment of retail value, and if permitted by the insurance policy, insurers could deduct a certain amount, usually between $500.00-$1,000.00, to reflect the dealer preparation or reconditioning of the vehicle, making the new "price" of the comparable vehicle $19,000.00-$19,500.00. Insurers often call this deduction

---

[1] States generally fall into two camps. First, there are states that, like Illinois, require payment of retail value (sometimes absent certain rare exceptions). *See, e.g.*, 10 C.C.R. § 2695.8(b)(2) (case settlements must be based on comparable vehicles "available for retail purchase" and cannot include any deductions "for the condition of a loss vehicle" unless it is in below average condition); Va. Admin. Code § 46.2-1600 (defining actual cash value to mean "retail cash value"); LA Rev Stat § 22:1892. Other states do not require calculations based on retail value, thus allowing, if permitted by the insurance policy, for calculations based on private party value. There is merit to both positions. On one hand, most insureds do not maintain their vehicles in retail condition, and thus indemnifying insureds ***in theory*** would be the amount to purchase a comparable vehicle in private party condition. On the other hand, most insureds will be purchasing a replacement vehicle from a dealer, and thus indemnifying insureds ***in reality*** would be the amount to purchase a comparable vehicle in retail condition. Irrespective of which is the better perspective, however, Illinois has chosen to require payment of retail value.

9

a dealer prep adjustment or condition adjustment or something similar. But the import is the same: it is a deduction to reflect that vehicles sold by dealerships are generally in better condition than vehicles sold by private parties because of the conditioning or dealer preparation money spent by dealerships to get the vehicle ready for retail sale. Like several other states, Illinois law, however, forbids such adjustments.

38. The Policy, therefore, obligates Standard to base an ACV cash settlement on the retail value of the vehicle.

39. The Policy also does not further define ACV as allowing for dealer preparation or reconditioning adjustments. Even if the Policy could be interpreted to allow for such adjustments, however, that would conflict with Illinois regulations, and the state-imposed requirements would control over the Policy language.

40. Taken as a whole, the Policy expresses the intent to pay, in the event of a total loss, the retail value of the total loss vehicle, not private party value, without deductions for dealer preparation or condition adjustments.

41. To the extent that there is any ambiguity in the Policy as to whether the ACV of a total loss vehicle would be based on retail value or private seller value, the Policy must be construed against Standard, and in favor of Standard's insureds, including Plaintiff.

42. Upon information and belief, each Class member was insured under Standard policies that were materially identical to Plaintiff Norman's Standard Policy with respect to Standard's obligation to pay ACV in the event of a total loss.

**D.**   *Standard's Method for Determining Vehicle ACV*

43. Standard determines the ACV of total loss vehicles through the use of a software platform called "CCC One" and a "Market Valuation Report" that is derived from this platform.

The platform was designed by a third-party, CCC Information Services, Inc. ("CCC"). A copy of Plaintiff's Market Valuation Report is attached as Exhibit B.

44. The CCC One software and platform is designed for and marketed to insurance companies.

45. Standard contracts with CCC, and CCC allows Standard to access and use the platform and Market Valuation Reports to adjust and settle total loss claims.

46. As a uniform and standard business practice, Standard uses the CCC platform to determine the ACV of every total loss vehicle.

47. CCC's methodology is to take comparable vehicles—usually between 5 and 12—offered for sale in the general market area of the total-loss vehicle, i.e., vehicles of the same year, make, and model. CCC then adjusts sale price of each individual vehicle to account for differences between the comparable vehicle and the total-loss vehicle. For example, if the comparable vehicle has less mileage than the total-loss vehicle, CCC reduces the sale price of the comparable vehicle to account for the fact that vehicles with more mileage have less value. After these adjustments, the average of the comparable vehicles' adjusted prices is the "base value" of the total-loss vehicle.

48. CCC has four "condition" levels: exceptional, retail (or dealer ready), private party average, and poor.

49. CCC imposes an across-the-board, flat "condition adjustment" to take the vehicle from retail value to "private party" value. In other words, CCC assumes every comparable vehicle is in retail condition, and thus imposes the "condition adjustment" to take the comparable vehicles from retail to private party. This adjustment is typically hundreds of dollars, and sometimes can range up to or even exceeding $1,000.00.[2]

---

[2] After the base value (with the condition adjustment applied to all comparable vehicles) is determined, CCC then makes adjustments based specifically on the condition of component parts

11

50. As such, through the CCC One software—and as reflected in the Market Valuation Report— Standard does not use the "retail value" of the total loss vehicle in determining the ACV.

51. As set forth above, Standard gathers a select number of similar vehicles of the same make, model, and year as the insured vehicle. Standard then applies an adjustment based on the mileage of the comparable vehicles compared to the mileage of the total loss vehicle. Standard is, thus far, using the retail value to determine ACV, just as it is required to do.

52. Defendant also applies an "options" adjustment, to account for differences in the optional equipment between the comparable vehicle and the total-loss vehicle. For example, if the total-loss vehicle has climate control but the comparable vehicle does not, Defendant, through CCC, would increase the price of the comparable vehicle to account for such difference (or vice versa). Thus fair, Defendant is still using retail value to determine ACV, just as it is required to do.

53. However, Standard then applies the aforementioned "condition adjustment" to the retail prices of the comparable vehicle to reduce the value from retail to private party.

54. This condition adjustment is functionally equivalent to a dealer prep or reconditioning or "get ready and go" adjustment. "Condition adjustment" is just the term that the CCC software happens to use. All such adjustments reflect an increased value where car dealerships take a car and get it into dealer ready condition.

---

of the total-loss vehicle itself, i.e., tires, interior, paint, etc. Said another way, the across-the-board "condition adjustment" is made to reduce the *comparable* vehicles to private party value to determine the base value, but then the condition of the *total-loss* vehicle is examined to arrive at the final adjusted vehicle value. So if the total-loss vehicle is in poor condition, a further reduction is imposed. Theoretically, however, all component parts of the total-loss vehicle might be in retail condition, meaning that the across-the-board "condition adjustment" would be wiped away. Plaintiff accounts for this possibility in the proposed Class definition by excluding those insureds who were paid retail value.

55. By applying the adjustment to reduce the comparable vehicles from retail to private party, Defendant was imposing the "dealer prep" adjustment explicitly foreclosed by Illinois law.

56. By applying the "condition adjustment" deduction, Standard is basing ACV on the private party value rather than retail value, in breach of its Policy and Illinois law.

E. *Standard Failed to Pay Plaintiff the ACV to Which She Was Entitled Because It Applied a Downward "Condition Adjustment" to All of the Comparable Vehicles Used to Determine ACV.*

57. Plaintiff owned a 2019 Dodge Charger insured by Defendant.

58. On or about November 16, 2021, Plaintiff was involved in an accident while operating the Insured Vehicle. Following the accident, Plaintiff filed a property damage claim with Defendant Standard, claim number iuq7908001.

59. Following the filing of Plaintiff's claim, Standard determined it was uneconomical or impossible to repair Plaintiff's vehicle to its pre-loss condition, and thus determined the vehicle was a total loss. Thus, Standard adjusted and settled the claim based on the Insured Vehicle's purported ACV.

60. Standard calculated the purported ACV of Plaintiff's vehicle by first determining the Insured Vehicle's "base value." Specifically, Standard determined that Plaintiff's Insured Vehicle had a base value of $27,481.00. (Ex. B at 1.)

61. To determine the base value, Standard took the average retail price of two comparable vehicles from car dealerships geographically similar to Plaintiff, all of which were the same make, model and year as the Insured Vehicle. (*Id*. at 10-11.)

62. To each of the two comparable vehicles, Standard then imposed a condition adjustment of $1,806.00, thereby reducing the vehicles from retail to private party. (*Id*.)

13

63. The Market Valuation Report explains that the "condition adjustment" sets the comparable vehicles to "Private Owner condition." (*Id*. at 10.)

64. By applying the "condition adjustment" to the comparable vehicles, Standard reduced the average retail price of a comparable vehicle by $1,806.00.

65. Standard did not determine the Insured Vehicle's "base value" based on the average retail value of comparable vehicles, but rather, based on the lesser average private owner value of comparable vehicles.

66. Plaintiff does not contest that the CCC report accurately reflects the average comparable vehicle retail price. Nor is it relevant to Plaintiff's allegations whether the CCC report accurately or inaccurately reflects the difference between average retail value and average private party value. Whatever the difference might be, the Policy and Illinois law require Standard to pay the *retail* value.

67. Standard breached its contract with Plaintiff by failing to use retail value to replace the Insured Vehicle in determining the ACV cash payment, and by deducting through the very type of dealer preparation/reconditioning adjustment that Illinois law forbids.

## CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All persons: (a) who insured a vehicle for physical damage coverage under an Illinois automobile insurance policy issued by Standard, (b) who made a claim under the policy comprehensive and/or collision coverage, (c) whose claim was determined to be a covered total loss, and (d) for whom Standard applied a flat "condition adjustment" to the retail price of comparable vehicles and who did not recover the full "condition adjustment" amount through adjustments based on the condition of the total-loss vehicle.

69. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members. Plaintiff reserves the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

70. **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiff is informed and believe that there are thousands of Class members, the precise number is unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

71. **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a. whether Defendant applies a "condition adjustment" to comparable vehicles when determining an insured vehicle's ACV in the settlement of total loss claims;

   b. whether Defendant is required to base its ACV settlement payments on retail value;

   c. whether Defendant's application of a "condition adjustment" to comparable vehicles when determining an insured vehicle's ACV in the settlement of total loss claims constitutes a breach of contract;

   d. whether the condition adjustment constitutes the equivalent of a "dealer prep" adjustment in violation of Illinois law and in breach of the Policy;

e.  the amount and nature of relief to be awarded to Plaintiff and the other Class members.

72.  **Typicality:** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members were all similarly affected by Defendant's application of a "condition adjustment" to ACV total loss settlement payments under Illinois insurance policies that provided for an ACV payment in the event of total loss.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

73.  **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to include sales tax and transfer fees in total loss situations, and Plaintiff intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected.

74.  **Superiority:**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the Class members to individually seek redress for Defendant's wrongful conduct.  Even if the Class members could afford litigation, the court system could not.

Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### COUNT 1
### BREACH OF CONTRACT

75. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-__ as if fully set forth herein.

76. Plaintiff brings this claim individually and on behalf of the other members of the Class.

77. Plaintiff and each of the other Class members was parties to insurance contracts with Standard, with terms set forth in the Standard Policy.

78. Plaintiff and each of the other Class members' insurance contracts are governed by Illinois law.

79. Plaintiff and each of the other Class members made claims under their insurance contracts, which Standard determined to be first-party total losses under the insurance contract, and additionally determined to be covered claims.

80. Standard invoked its ACV limit of liability clause and purported to pay Plaintiff and each of the other Class members the ACV of their total loss vehicles.

81. Under the Policy as interpreted under Illinois law, Defendant's ACV payment was required to be based on the vehicle's retail value. Instead, however, through application of a conditioning adjustment, Defendant's ACV payment was based on private party value, not retail value.

82. Defendant's conditioning adjustment also constituted the functional equivalent of a dealer preparation adjustment, in violation of Illinois law.

83. Defendant breached its contract with Plaintiff and each of the other Class members.

84. As a result of the contractual breaches, Plaintiff and each of the other Class members have been damaged in that they received less than what was promised in their contracts, and they are entitled to actual damages in the amount of the condition adjustments divided by the number of comparable vehicles, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a. An order certifying the proposed Class as requested herein, and appointing Plaintiff's undersigned attorneys as Counsel for the Class;

b. An award of compensatory damages, and all other available damages, for Plaintiff and the other Class members against Standard, as well as pre- and post- judgment interests on any amounts awarded;

c. An order enjoining Standard from continuing the illegal practices alleged herein, and for other injunctive relief as is proven appropriate in this matter;

d. An award of attorney's fees, expenses, and costs of suit as appropriate pursuant to applicable law

e. An order providing such other and further forms of relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 21, 2022                                  Respectfully submitted,

                                                                  **SHAMIS & GENTILE, P.A.**
/s/ Andrew J. Shamis
Andrew J. Shamis, Esq.
Illinois Bar No. 6337427
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299